## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA WAYCROSS DIVISION

| | |
|---|---|
| BRIGID CAPPELLETTI and SCOTT CHESLA, *Plaintiffs*, v. GEORGIA DEPARTMENT OF COMMUNITY AFFAIRS (DCA), CHRISTOPHER NUNN, in his official capacity as Commissioner of DCA, WESLEY BROOKS, in his official capacity as Deputy Commissioner of Homeownership for DCA, GOVERNOR'S OFFICE OF PLANNING AND BUDGET (OPB), RICHARD DUNN, in his official capacity as Director of OPB, TREY BENNETT, in his official capacity as Director of the Grants Division and General Counsel of OPB, *Defendants*. | Civil Action No. _CV 525-009_____ **Complaint – Class Action** **JURY TRIAL DEMANDED** |

1

## CLASS ACTION COMPLAINT

Plaintiffs Brigid Cappelletti and Scott Chesla bring this action for damages and declaratory and injunctive relief on behalf of themselves and a Class of others who were similarly discriminated against based on the color of their skin. Plaintiffs bring this case against the following Defendants, who are responsible for carrying out an unconstitutional, race-based social agenda: Georgia Department of Community Affairs ("DCA"), Wesley Brooks, in his official capacity as Deputy Commissioner of Homeownership for DCA, Governor's Office of Planning and Budget ("OPB"), Richard Dunn, in his official capacity as Director of OPB, Trey Bennett, in his official capacity as Director of the Grants Division and General Counsel of OPB (collectively "DCA").

DCA has developed, marketed, and administered (and continues to administer) its Georgia Mortgage Assistance program on the basis of race. DCA's discrimination in the provision of COVID-19 relief funds violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to damages, declaratory judgment, and injunctive relief.

### INTRODUCTION

1.    DCA has systematically discriminated against white homeowners when providing COVID-19 relief and continues to do so. As part of its Georgia Mortgage Assistance program, DCA has prioritized "socially disadvantaged individuals" in everything from the development and marketing of its program to approving applications. DCA impermissibly identifies "socially disadvantaged individuals" based on their race.

2.    According to DCA, the "following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, Asian Americans, and Pacific Islanders," and DCA automatically considers applicants who "list[]" one of the previous "ethnicities" as being "[s]ocially [d]isadvantaged." State of Georgia, U.S. Dep't of the Treasury, Homeowner Assistance

Fund Plan HAFP-0102, at 5, 13 (Dec. 21, 2021), https://perma.cc/KEN8-S5BN ("Georgia Plan Submission"). Homeowners of DCA's preferred racial and ethnic groups are considered socially disadvantaged. White homeowners—which include many different ethnicities and nationalities such as homeowners of Caucasian, Jewish, Middle Eastern and North African descent— are not.

3.       Homeowners designated as socially disadvantaged based on their race have clear advantages under the Georgia Mortgage Assistance program. For example, socially disadvantaged individuals could apply for relief if their income was equal to or less than 150% of the Area Medium Income ("AMI"). DCA, Georgia Mortgage Assistance: Frequently Asked Questions, https://perma.cc/96VM-5QUJ ("Georgia Mortgage Assistance FAQ"); DCA, HAFP-0102-Georgia, Treasury Feedback for Resubmission of Plan, at 4, https://perma.cc/3VS2-SY6 ("Treasury Feedback") ("Homeowners who do not identify as Socially Disadvantaged either by attestation or race or ethnicity can only be considered at 100% AMI. Socially Disadvantaged homeowners can be considered up to 150% AMI.").

4.       Because of this race-based classification, a white homeowner with a household size of 3 in Fulton County, Georgia, based on 2022 AMI calculations, could not apply for relief if the homeowner's income was greater than $90,000 (100% AMI) unless he or she could otherwise qualify as socially disadvantaged, but homeowner of DCA's preferred racial and ethnic with the same household size could apply with an income of up to $130,150 (150% AMI). DCA, GMA Overview at 5:41, https://perma.cc/PN2X-5E9U ("GMA Overview").

5.       This is just one of many ways in which DCA's race-based program discriminated against white homeowners. DCA also prioritized socially disadvantaged individuals in how it marketed its program—targeting its messaging about the program to its preferred racial groups—and

in distributing funds to applicants whose income was below 100% AMI—prioritizing assistance to homeowners of DCA's preferred racial and ethnic groups.

6.     As a result of DCA's racial discrimination, white homeowners (including Plaintiffs) who struggled with the economic consequences of the COVID-19 pandemic have lost out on financial assistance they needed to pay their mortgages. For example, Plaintiff Brigid Cappelletti contracted COVID-19 and missed work, causing her to experience a significant loss of income and to go into mortgage forbearance. Likewise, Plaintiff Scott Chesla was forced to leave his job due to risks of infection from COVID-19, causing him to experience a significant loss of income and to get behind on his mortgage. But when Plaintiffs Cappelletti and Chesla applied for assistance through the Georgia Mortgage Assistance program, DCA denied their applications despite their eligibility for assistance. Plaintiffs Cappelletti and Chesla—and many other Georgia homeowners like them—needlessly suffered and continue to suffer financial hardships because of DCA's illegal race-based social agenda.

7.     There is no justification for DCA's racial discrimination. DCA could have administered its program in a race-neutral way. Instead, it discriminated against white homeowners in favor of homeowners from its preferred racial groups. But COVID-19 did not discriminate. Georgia homeowners of all races needed and still need assistance.

8.     DCA's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry

instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

9.  Plaintiffs and the Class are entitled to damages and declaratory and injunctive relief under Title VI and the Equal Protection Clause.

## JURISDICTION & VENUE

10.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.  This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Georgia.

12.  Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant is a resident of this District and all Defendants are residents of Georgia, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

13.  Specifically, Defendant DCA maintains an office in Waycross, Georgia, where it conducts substantial business and which is in the Waycross Division of this District. DCA has also distributed funds from its Georgia Mortgage Assistance program throughout this District, totaling over $13.6 million to at least 700 homeowners, including to at least $500,000 to 37 homeowners in the Waycross Division. *See* State of Georgia, HAF Quarterly Report to U.S. Dep't of the Treasury, HAF QR 2024Q1, at 7 (May 3, 2024), attached as Exhibit 1 at 16-34. Moreover, Defendant DCA resides in this District because it is "an entity with the capacity to sue and be sued" and is "subject to the court's personal jurisdiction with respect to" this action. 28 U.S.C. § 1391(c)(2).

## PARTIES

14.  Plaintiff Brigid Cappelletti is a resident of Georgia.

15.  Plaintiff Scott Chesla is a resident of Georgia.

16.  Defendant Georgia Department of Community Affairs ("DCA") is a state agency in the "department of the executive branch of state government." O.C.G.A. § 50-8-1. Created in

1977, DCA's "core businesses" are to provide "safe and affordable housing, local government assistance, and community and economic development." DCA, About DCA, https://perma.cc/5VQQ-D4PX. DCA also "distribut[s]" "[h]undreds of millions of dollars . . . annually through grants, tax credits, loans, and other resources." *Id.* DCA was awarded and is responsible for overseeing distribution of $354,185,231 in federal homeowner assistance fund grants from the U.S. Treasury. Georgia Plan Submission at 1-2, 22. DCA developed the Georgia Mortgage Assistance program and currently markets and administers the program.

17.     Defendant Christopher Nunn is the Commissioner of DCA. DCA, DCA Leadership: Christopher Nunn, https://perma.cc/X22F-BSWV. As Commissioner, he is the "department head, whose duties . . . include serving as the department's chief executive officer and administrative head." O.C.G.A. § 50-8-5. As the head of DCA, he is responsible for overseeing the development, marketing, and administration of DCA's Georgia Mortgage Assistance program. Defendant Nunn is sued in his official capacity.

18.     Defendant Wesley Brooks is the Deputy Commissioner of Homeownership for DCA. As Deputy Commissioner of Homeownership, he is responsible for "oversee[ing] . . . the Georgia Mortgage Assistance program," including the development, marketing, and administration of the program. DCA, DCA Leadership: Wesley Brooks, https://perma.cc/N6Y4-6RNV. Defendant Brooks is sued in his official capacity.

19.     Defendant Governor's Office of Planning and Budget (OPB) is an executive office within the office of the Governor, which serves as "a separate budget unit for the purpose of promoting economy and efficiency in the fiscal management of the state government." O.C.G.A. § 45-12-72(a). OPB "supports the state by producing short- and long-term financial analyses, running budget development, and overseeing fiscal controls." OPB, About OPB, https://perma.cc/AY7B-

KN35. OPB was awarded and is responsible for overseeing distribution of $354,185,231 in federal homeowner assistance fund grants from the U.S. Treasury. Georgia Plan Submission at 1-2, 22. In conjunction with DCA, OPB oversees the development, marketing, and administration of the Georgia Mortgage Assistance program.

20.    Defendant Richard Dunn is the Director of OPB. As Director of OPB, he is in charge of "providing the executive administration and management of the agency." OPB, Divisions, https://perma.cc/4B7K-F72Q. His management of OPB includes overseeing requests for and distributions of federal funds, including the federal funds for the Georgia Mortgage Assistance program. As Director of OPM, he oversees the development, marketing, and administration of the Georgia Mortgage Assistance program. Defendant Dunn is sued in his official capacity.

21.    Defendant Trey Bennett is the Director of the Grants Division and General Counsel of OPB. As Director of the Grants Division and General Counsel, he is "[r]esponsible for the implementation and management of all grant programs administered by [OPB]," *id.*, including the federal funds for the Georgia Mortgage Assistance program. As Director of the Grants Division and General Counsel, he oversees the development, marketing, and administration of the Georgia Mortgage Assistance program. Defendant Bennett is sued in his official capacity.

## LEGAL FRAMEWORK

22.    Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

23.    As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause is 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) ("*Fearless Fund Mgmt.*") (describing "race discrimination as

'subtle, pervasive, and essentially irremediable'" and noting that the burden of complying with Civil Rights statutes "pales in comparison to the interest in rooting out race discrimination in all its forms").

24.    Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

25.    Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

26.    Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

27.    Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason—"racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz*, 539 U.S. at 270). That is why, under strict scrutiny, "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest." *Holman v. Vilsack*, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)); *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 926 (11th Cir. 1997) ("The

essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option." (quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993))). Under strict scrutiny, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests' and, if so (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

28.     In sum, these constitutional and statutory standards require that all applicants for assistance in Florida—for school admission, government contracts, or, as relevant here, government assistance—are able to utilize "an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *5 (N.D. Tex. July 31, 2024) ("*Founders First Cmty.*") (quoting *SFFA*, 600 U.S. at 201-06).

## FACTUAL ALLEGATIONS

### I.     DCA's Discriminatory Homeowner Assistance Fund Program

#### A.  American Rescue Plan Act's Homeowner Assistance Fund

29.     In March 2021, during the COVID-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner

Assistance Fund. *See* Pub. L. No. 117- 2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

30.     The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

31.     Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' requirements. *Id.* § 9058d(d)(2).

32.     The Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, but it largely leaves states to run their own specific programs based on their own implementation plans. The Treasury initially released 10% of each state's eligible funds for states to use in implementing pilot programs. To receive the rest of the funds, states were required to submit their proposed plans to implement and administer the full program. When states submitted their plans, they requested a specific amount of funds. The Treasury reviewed the states' plans and provided feedback and recommendations before approving the plans and distributing the remaining funds. U.S. Dep't of the Treasury, HAF Plans, https://perma.cc/S8Z4-BQ8G.

**B.   U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals**

33.     The Act requires states to prioritize the distribution of funds to target specific populations of homeowners.

34.     First, the Act specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income

for their household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." 15 U.S.C. § 9058d(c)(2).

35.     Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

36.     The Act does not define "socially disadvantaged individuals."

37.     In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of socially disadvantaged individual, explicitly defining that term based on race and including a presumption that individuals of particular races are socially disadvantaged:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2 (Apr. 14, 2021) (emphasis omitted), https://perma.cc/QYY4-6GBY.

38.     A few months later, in August 2021, the Treasury issued updated guidance redefining the term "socially disadvantaged individual." The new definition still provided that individuals who were "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" were socially disadvantaged. The full updated definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control.

Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

*The Homeowner Assistance Fund in the American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/EYQ8-LTLG (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

39.    The Treasury has used the same definition of socially disadvantaged individual in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2-3 (June 12, 2023), https://perma.cc/VM86-S2DM.

40.    The Treasury's guidance is not mandatory or binding on the States.

**C.  Georgia Mortgage Assistance Program**

41.    DCA submitted its initial proposal for implementing its HAF plan in August 2021, and after receiving and responding to feedback from the U.S. Treasury, DCA's final proposal was approved in January 2022. DCA was awarded $354,185,231 in HAF funds. Georgia Plan Submission at 2.

42.    DCA entitled its HAF program "Georgia Mortgage Assistance."

43.    Under DCA's Georgia Mortgage Assistance program, homeowners are eligible for up to $50,000 of relief. Georgia Mortgage Assistance FAQ. Eligible homeowners can obtain relief in the form of mortgage reinstatement, principal curtailment, or housing related expenses. *Id.*

44.     DCA's Georgia Mortgage Assistance program is still accepting and processing applications and distributing financial assistance.

### D.  DCA Considered Race When Developing, Marketing, and Administering its Georgia Mortgage Assistance Program

45.     In developing its Georgia Mortgage Assistance program, DCA chose to adopt a race-based definition of socially disadvantaged individuals in a manner not required by the Act.

46.     DCA's race-based definition of socially disadvantaged individual was more narrow and racially specific than the definition suggested in non-binding Treasury guidance.

47.     DCA's plan submission included both versions of the Treasury's definition for socially disadvantaged. In describing the quantitative data it used in developing its program, DCA's plan stated that:

> Socially disadvantaged individuals are those that have been subject to racial or ethnic prejudice or cultural bias because of their identity. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, Asian Americans, and Pacific Islanders.

Georgia Plan Submission at 5. Later in the submission, DCA used the revised Treasury definition, including the factor of being a "member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." *Id.* at 13. But DCA's submission made clear that its plan automatically treated applicants of DCA's preferred minority and ethnic groups as socially disadvantaged individuals, stating that applicants could either "sign an affidavit if they identify as a Socially Disadvantaged Individual," or that if applicants "fail[ ] to provide the affidavit but . . . list[ ] the ethnicities previously identified [they] will be considered Socially Disadvantaged." *Id.* In other words, under DCA's plan, applicants of DCA's preferred minority and ethnic groups are automatically considered socially disadvantaged individuals, but white applicants have

to meet one of the Treasury definition's other socially disadvantaged factors and take additional steps to be considered socially disadvantaged.

48.    DCA has applied its race-based definition of socially disadvantaged individuals consistently—according to DCA's quarterly reports to the Treasury, every non-white applicant granted assistance has been labeled as a socially disadvantaged individual. Exhibit 1 at 12. More-over, the same reporting data shows that DCA treats the socially disadvantaged factor as a proxy for race, with over 93% of socially disadvantaged homeowners being labeled socially disadvan-taged because of meeting the "Racial or Ethnic Prejudice-Targeted" factor. *Id.* at 14.

49.    DCA's exclusion of white homeowners from its definition of socially disadvantaged individual results in discriminatory harm to a host of different ethnicities and nationalities. For example, "[t]he majority of U.S. Jews identify as White." Pew Research Center, Race, Ethnicity, Heritage and Immigration Among U.S. Jews (May 11, 2021), https://perma.cc/G4AP-JGUU. Moreover, the U.S. Census Bureau treats Persian and Iranian individuals as white. U.S. Census Bureau, 3.5 Million Reported Middle Eastern and North African Descent in 2020 (Sept. 21, 2023), https://perma.cc/K6V4-PP27.

50.    DCA has utilized its race-based definition of socially disadvantaged individuals in deciding how to develop its program, how and where to market and advertise its program, and how to prioritize granting applications and distributing program funds. In doing so, it has prioritized homeowners from its preferred racial and ethnic groups over white homeowners.

51.    In developing its plan, DCA analyzed "quantitative data" regarding "socially and economically disadvantaged metrics" and in order "[t]o target the areas having the greatest need," it "examined metrics for the state at the county and/or zip code level, for housing mortgage distress, socially disadvantaged populations, economically distressed, and disadvantaged areas." Georgia

Plan Submission at 3. It listed factors including "Socially Disadvantaged" and "Minority Concentration" under its plan development summary. *Id.* at 3-4. And as noted above, it adopted the Treasury's rebuttable presumption that "Black Americans, Hispanic Americans, Native Americans, Asian Americans, and Pacific Islanders" were socially disadvantaged in developing its plan. *Id.* at 5. In short, it considered race in developing policies and procedures for how (and to whom) to conduct outreach about its program and how to prioritize financial relief to socially disadvantaged individuals.

52.    In marketing and advertising its program to inform Georgia citizens about the availability of funds and how to apply, DCA targeted outreach to localities with concentrated populations of its favored racial and ethnic groups—at the expense of white homeowners—based on its definition of socially disadvantaged individuals. DCA's plan submission indicates that DCA made "public communications" and undertook "community outreach efforts" to market its Georgia Mortgage Assistance program by partnering "with organizations that primarily target" "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." *Id.* at 13-14.

53.    In describing its plan, DCA stated that data it analyzed in developing its plan "allowed targeting Socially Disadvantaged areas." Treasury Feedback at 2. Specifically, DCA targeted its outreach and marketing to 30 out of Georgia's 152 counties based on, among other things, "minority population." Jennifer Wade, HAF Annual Report to U.S. Dep't of the Treasury, HAF AR 2022, at 7 (Nov. 10, 2022), attached as Exhibit 2. DCA "tasked" a "marketing group" "with targeting [those] 30 counties." *Id.* The marketing and outreach campaign to these counties included a "SMS Text messaging campaign" and "[m]edia campaigns." *Id.*

54. DCA also utilized mortgage servicers to direct outreach about the Georgia Mortgage Assistance program to individuals based on race. DCA touted its "good working relationships with many servicers." *Id.* at 8. DCA "reached out to [its servicer] contacts prior to the program[']s approval to start collecting collaboration agreements, and continued to reach out during the approval process to update and add new contacts, and to share the program information." *Id.*; *see also* Georgia Plan Submission at 5 ("[DCA] communicate[d] with mortgage servicers regarding the development of its program design."). DCA stated that it "coordinated Georgia HAF messaging" with servicers, including "work[ing] closely with" one servicer to "create[e] a letter they mailed to their borrowers" and "provid[ing] program information to their borrowers via two webinars" and working with others "to provide mailing content and/or webinar sessions for their customers." Jonna West, HAF Annual Report to U.S. Dep't of the Treasury, HAF AR 2023, at 9 (Nov. 14, 2023), attached as Exhibit 3.

55. In reviewing and granting applications, DCA prioritizes applications based on race, prioritizing applications submitted by homeowners in DCA's preferred racial and ethnic groups over those submitted by white homeowners.

56. The clearest example of DCA's race-based prioritization is its explicit exclusion of certain racial groups with incomes between 100% and 150% AMI. Under DCA's plan, all applicants with income equal to or less than 100% AMI meet DCA's income requirements and can apply for assistance, but only "socially disadvantaged individuals" can apply for assistance if their income exceeds 100% AMI. *See* Treasury Feedback at 4 ("Homeowners who do not identify as Socially Disadvantaged either by attestation or race or ethnicity can only be considered at 100% AMI. Socially Disadvantaged homeowners can be considered up to 150% AMI."); Georgia Mortgage Assistance FAQ ("This Program has income limits. The total household income must be equal to

or less than 100% Area Median Income for the county of residence, OR [t]he household income must be equal to or less than 150% Area Median Income for the county of residence if the home-owner, borrower, or spouse (residing in the home) is considered a socially disadvantaged individual."); GMA Overview at 5:41 ("Applicants' total household income must meet Area Median Income (AMI) limits at the time of the hardship or at the time of the application: 150% AMI or less if socially disadvantaged, 100% AMI or less for all other applicants.").

57.    Therefore, as explained in one of DCA's public-facing marketing videos about the Georgia Mortgage Assistance program, for a 3-person household in Fulton County, Georgia, the "AMI [required] for [socially disadvantaged individuals]" is "<$130,150 = 150% AMI" while the "AMI [required] for Non[-socially disadvantaged individuals]" is "<$90,000 = 100% AMI." GMA Overview at 5:41. In other words, an applicant of one of DCA's preferred racial and ethnic groups with income between 100% and 150% AMI can apply for assistance, but a white applicant whose income falls in that same range and who is not otherwise socially disadvantaged cannot. *See* Gleen E. Roper, *Are Georgia and Oklahoma Racially Discriminating in a Homeowners' Covid Relief Program?*, The Hill (Dec. 19, 2022), https://perma.cc/7N7F-KQDU ("[W]hite homeowners in Georgia . . . with incomes that are slightly above average are excluded from relief, while racial minorities with similar incomes are eligible — just because of their race.").

58.    DCA adheres to this race-based exclusion of white homeowners with incomes between 100% and 150% in its processing of applications. According to cumulative data from the first quarter of 2024, all but one of the applications approved within that income range were made by socially disadvantaged applicants. Exhibit 1 at 13.

59.    DCA advertised this race-based income restriction assistance in its public-facing marketing materials, making clear to white homeowners that they need not apply if they fell within

the income range of 100% to 150% AMI unless they could show they were otherwise socially disadvantaged on another factor beyond their race. *See* DCA, Georgia Mortgage Assistance Program (Jan. 1, 2024), https://perma.cc/8VD8-LZ8S ("Applicants' total household income meets Area Median Income (AMI) limits at the time of the hardship or at the time of the application: 150% AMI or less if socially disadvantaged, 100% AMI or less for all other applicants."); GMA Overview at 5:41.

60.     DCA also prioritizes socially disadvantaged individuals with incomes below 100% AMI. This prioritization includes preferences in granting applications and distributing funds—*i.e.*, applications submitted by homeowners of DCA's preferred racial and ethnic groups are given priority over applications submitted by white homeowners.

61.     Upon information and belief, DCA's prioritization also included preference in assisting applicants with the applications process, prioritizing application assistance to applicants of DCA's preferred minority racial and ethnic groups over white applicants.

62.     DCA requires all applicants to select their race in completing and submitting an application. It then uses applicants' race to determine whether they should be prioritized for assistance as socially disadvantaged individuals.

63.     DCA also tracked the progress of its program through disaggregating metrics by, among other things, race and ethnicity. *See* Exhibit 1 at 9-15.

64.     DCA's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. *Out of the approved applications, 82% of homeowners were black and 17% were white*. Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q3, 2024, https://perma.cc/P6DP-FMQK. But those statistics do not reflect the

population of Georgia, where about 33.2% of Georgia citizens are black and 58.7% of citizens are white. U.S. Census Bureau, Quick Facts: Georgia, https://perma.cc/57JX-KQS3. This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about 50.5% of Georgia citizens below the poverty line are black and 45.6% are white. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/3PTH-63GC.

65.    Moreover, according to quarterly reporting data DCA submitted to the Treasury, DCA approved applications from applicants of its preferred racial and ethnic groups at a higher rate than those from white applicants. Out of all non-white applicants, about 20.04% of applicants were approved while out of all white applicants, about 12.74% of applicants were approved. Exhibit 1 at 9.

**II.    Effect of DCA's Racial Discrimination on Plaintiffs**

66.    Because of DCA's race-based implementation of its Georgia Mortgage Assistance program, Plaintiffs were denied the opportunity to receive funds from the program because of their race.

**A.  Plaintiff Brigid Cappelletti**

67.    Plaintiff Brigid Cappelletti is a resident of Georgia.

68.    Plaintiff Cappelletti is white.

69.    Plaintiff Cappelletti owns a home in Georgia and has a mortgage on the home.

70.    Plaintiff Cappelletti is a rigging electrician in the film and television industry.

71.    During the COVID-19 pandemic, Plaintiff Cappelletti contracted COVID-19, which ultimately developed into a chronic illness called "Long COVID" which caused symptoms

that made her unable to work for several months. These events related to the COVID-19 pandemic caused Plaintiff Cappelletti to experience a significant decrease in income.

72.     Plaintiff Cappelletti also experienced a significant increase in housing and living expenses after the start of the COVID-19 pandemic.

73.     Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Cappelletti struggled to pay her bills, including her mortgage.

74.     For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Cappelletti was forced to enter a period of mortgage forbearance.

75.     Plaintiff Cappelletti applied for financial assistance through DCA's Georgia Mortgage Assistance program.

76.     Plaintiff Cappelletti was eligible for financial assistance through DCA's Mortgage Assistance Fund program because she met its income limits and other requirements.

77.     Plaintiff Cappelletti applied for relief under the program, but DCA denied her application.

78.     Upon information and belief, DCA's denial of Plaintiff Cappelletti's application was due to DCA's race-based criteria, including its prioritization of applications and distribution of funds.

79.     Upon information and belief, Plaintiff Cappelletti would have received financial assistance had DCA not discriminated based on race.

80.     Because Plaintiff Cappelletti's application was denied, she was unable to obtain financial assistance for her mortgage, including assistance related to her mortgage forbearance.

81.     Therefore, Plaintiff Cappelletti was harmed by DCA's racial discrimination.

**B. Plaintiff Scott Chesla**

82.    Plaintiff Scott Chesla is a resident of Georgia.

83.    Plaintiff Chesla is white.

84.    Plaintiff Chesla owns a home in Georgia and has a mortgage on the home.

85.    Plaintiff Chesla is an engineer.

86.    Prior to the COVID-19 pandemic, Plaintiff Chesla worked for a company in Arizona, which required frequent travel.

87.    After the COVID-19 pandemic began, Plaintiff Chesla was forced to leave his job in Arizona due to increased risks of COVID-19 to him and his family and the need to care for his wife and daughter, both of whom contracted COVID-19 around this time.

88.    Plaintiff Chesla had difficulty finding a new job in Georgia because of the COVID-19 pandemic's effect on his industry.

89.    These events related to the COVID-19 pandemic caused Plaintiff Chesla to experience a significant decrease in income.

90.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Chesla struggled to pay his bills, including his mortgage.

91.    For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Chesla missed mortgage payments and was more than one month behind on his mortgage.

92.    Plaintiff Chesla applied for financial assistance through DCA's Georgia Mortgage Assistance program.

93.    Plaintiff Chesla was eligible for financial assistance through DCA's Mortgage Assistance Fund program because he met its income limits and other requirements.

94.     Plaintiff Chesla applied for relief under the program, but DCA denied his application.

95.     Upon information and belief, DCA's denial of Plaintiff Chesla's application was due to DCA's race-based criteria, including its prioritization of applications and distribution of funds.

96.     Upon information and belief, Plaintiff Chesla would have received financial assistance had DCA not discriminated based on race.

97.     Because Plaintiff Chesla's application was denied, he was unable to obtain financial assistance for his mortgage, including his delinquent mortgage payments.

98.     Therefore, Plaintiff Chesla was harmed by DCA's racial discrimination.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action on behalf of themselves, and other Georgia homeowners similarly entitled to relief.

100.     The Class here consists of all Georgia homeowners who are white, who were otherwise eligible for funds under the Georgia Mortgage Assistance program but did not meet DCA's definition of socially disadvantaged individual, and were denied the opportunity to receive funds from the program because of DCA's race-based prioritizing of applications.

101.     Class members are seeking damages from DCA under Title VI for unlawful discrimination in the development, marketing, and administration of the Georgia Mortgage Assistance program.

102.     Class members are also seeking declaratory and injunctive relief under both Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Georgia Mortgage Assistance program unlawful and requiring DCA to stop administering the program in a racially discriminatory manner.

103.    In the alternative, Class members are seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Georgia Mortgage Assistance Program unlawful, requiring DCA to stop administering the program in a racially discriminatory manner, and requiring DCA to remarket the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

104.    The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

105.    The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Georgia and the thousands of homeowners who applied for the Georgia Mortgage Assistance program, there are at least thousands of members of the proposed Class.

106.    Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

    a.    Whether DCA defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

    b.    Whether DCA intentionally targeted non-white homeowners in its Georgia Mortgage Assistance program;

    c.    Whether DCA intentionally prioritized non-white homeowners in its review of Georgia Mortgage Assistance applications;

d.    Whether DCA discriminated against Class members on the basis of their race;

e.    Whether DCA's challenged conduct violates Title VI; and

f.    Whether DCA's challenged conduct violates the Equal Protection Clause.

107.    Plaintiffs' claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Georgia homeowners, who were eligible for funds under the Georgia Mortgage Assistance program, are white and otherwise did not meet DCA's definition of socially disadvantaged individuals, and who (i) applied for the program and were denied funds or had the processing of their application delayed or (ii) were not permitted to apply for the program because of their race. They were therefore similarly affected by DCA's wrongful conduct complained of herein.

108.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiffs have no interests adverse or antagonistic to the Class.

109.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage servicer information, and publicly available data. Class-wide damages also can be readily calculated based on the information available in DCA's Georgia

Mortgage Assistance program. Prosecution as a class action will eliminate the possibility of unnecessary, repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the COVID-19 pandemic.

110.    The Class is also certifiable under Federal Rule of Civil Procedure 23(b)(2). *See Miller v. Vilsack*, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (certifying 23(b)(2) class in challenge to USDA's distribution of loan forgiveness to "socially disadvantaged" applicants). DCA has discriminated and continues to discriminate on grounds that apply generally to the Class—namely, prioritizing applications for the Georgia Mortgage Assistance program based on race. Therefore, declaratory and injunctive relief declaring that DCA's development, marketing, and implementation of its Georgia Mortgage Assistance program is unlawful and requiring DCA to stop administering the program in a racially discriminatory manner in the distribution of any remaining funds, or, in the alternative, to remarket the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN PRIORITIZATION OF APPLICATIONS

111.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

112.    **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

113.    This provision of Title VI may be enforced through suits by private individuals for damages and injunctive relief. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

114.    To establish a cause of action pursuant to Title VI, a plaintiff must prove the following elements: "(1) the defendant received federal financial assistance; (2) the plaintiff was an intended beneficiary of the program or activity receiving the assistance; and (3) the defendant discriminated against the plaintiff on the basis of race, color, or national origin in connection with that program or activity." *Drayton v. McIntosh Cnty., Georgia*, 2019 WL 13260160, at *8 (S.D. Ga. Mar. 7, 2019); *Collier v. Ala. Dep't of Trans.*, 2018 WL 6620176, at *2 (N.D. Ala. Dec. 18, 2018); *Alexander*, 532 U.S. at 280.

115.    Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

116.    "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring); *see Founders First Cmty.*, 2024 WL 3625684 at *3-4 (holding that plaintiff's discrimination claim pursuant to 42

U.S.C. § 1981 likely to succeed on the merits because program "discriminates against applicants . . . based on race").

117.    But, at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

118.    **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

119.    Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is never a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted). Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past

discrimination" is not a compelling interest because it "provides no guidance for [the government] to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

120.    Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

121.    If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207. To be narrowly tailored, a racial classification must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *Id.* at 230. This means that it must be targeted—i.e., it cannot be over- or under-inclusive. *See id.* at 216; *see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *SFFA*, 600 U.S. at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

122.    **DCA's Use of Race in Prioritizing Applications Fails Strict Scrutiny.** DCA received federal financial assistance from the HAF program and intentionally used and continues to use those federal funds to prioritize granting applications and distributing funds to homeowners in preferred racial and ethnic groups over white homeowners through its Georgia Mortgage Assistance program.

123.    DCA has used and continues to use the term "socially disadvantaged individual" as a proxy for non-white homeowners of its preferred racial and ethnic groups in the development, marketing, and administration of its Georgia Mortgage Assistance program. Specifically, DCA prioritized and continues to prioritize applications submitted by those "socially disadvantaged individuals" over white homeowners.

124.    The clearest example of DCA's racial discrimination is the fact that white homeowners with annual household income between 100% and 150% AMI are barred from applying (or have had their application denied) unless they can meet some other socially disadvantaged individual factor while non-white homeowners automatically meet DCA's income limit for that income-range because they are assumed to be socially disadvantaged individuals. *See Founders First Cmty.*, 2024 WL 3625684, at *3 (enjoining grant applicant program under 42 U.S.C. § 1981 where program "insisted that applicants must belong to one of its preferred demographic groups"). That race-based barrier to applying for relief alone makes DCA's Georgia Mortgage Assistance program subject to strict scrutiny.

125.    DCA also used race in prioritizing applications at all income levels based on its definition of socially disadvantaged individuals. DCA's application for assistance required all applicants to provide their race and ethnicity before submitting the application or receiving assistance. Indeed, DCA's online application for assistance "requires disclosure of race and demands demographic information . . . before [approved applicants] are selected." *Id.* at *4 (cleaned up) (holding that program application that "require[d] disclosure of race and demands demographic information . . . before [approved applicants] are selected" discriminated based on race); DCA, How to Complete Your Application at 2:36, https://perma.cc/RUC5-KM2F.

126.    Many eligible white homeowners—like Plaintiffs Cappelletti and Chesla—were eligible for assistance and applied for DCA's Georgia Mortgage Assistance program but were denied due to DCA's use of race in prioritizing applications under its program.

127.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of "socially disadvantaged" applicants based on race failed strict scrutiny); *Strickland v. U.S. Dep't of Agric.*, 2024 WL 2886574, at *9 (N.D. Tex. June 7, 2024) (holding that USDA's Emergency Relief Program's distribution of more relief funds to "socially disadvantaged farmers" than white farmers failed strict scrutiny); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 509 (N.D. Tex. 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1294 (M.D. Fla. 2021) (holding that USDA's distribution of loan forgiveness to "socially disadvantaged" applicants based on race failed strict scrutiny); *Holman*, 2021 WL 2877915, at *6 (same); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (same).

128.    And courts, including the Eleventh Circuit, have recently held other race-based application programs to be unlawful under similar civil rights statutes. *See Fearless Fund Mgmt.*, 103 F.4th at 769, 777 (holding that private grant contest "open only to businesses owned by black women" unlawfully discriminated on the basis of race in violation of 42 U.S.C. § 1981); *Founders*

*First Cmty.*, 2024 WL 3625684, at *3-4 (holding that private small business grant program that required "applicants [to] identify as . . . Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a low to moderate income area" unlawfully discriminated "based on race" in violation of 42 U.S.C. § 1981).

129.    Because DCA's Georgia Mortgage Assistance program prioritized and continues to prioritize applications based on race, strict scrutiny applies.

130.    DCA's race-based prioritization scheme for reviewing and granting applications through its Georgia Mortgage Assistance program fails to satisfy strict scrutiny.

131.    DCA's use of race in prioritizing applications to socially disadvantaged individuals does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination against a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

132.    Moreover, DCA's use of race to prioritize socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination. Rather, the Georgia Mortgage Assistance program is based on a generalized notion of remedying past societal discrimination for homeowners of its preferred racial and ethnic groups, declaring homeowners to be socially disadvantaged individuals if they are a "[m]ember of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Georgia Plan Submission at 13; Exhibit 1 at 38. In other words, the program was not targeted toward some specific episode of past, intentional discrimination in which DCA had participated.

133.    Even if DCA could show a compelling interest in its race-based Georgia Mortgage Assistance program, the program is not narrowly tailored.

134.    *First*, DCA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing applications according to a race-based definition of socially disadvantaged individuals.

135.    For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK ("Texas HAF Plan").

136.    California, too, used race-neutral criteria to prioritize aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 10-11 (Dec. 9, 2021), https://perma.cc/6LBT-A9P9 ("California HAF Plan"). As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/MEC2-44E8 ("HUD, Qualified Census Tracts and Difficult Development Areas"). As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of

households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/7M6T-T4GM ("UCLA, California COVID-19 Owner Vulnerability").

137.    DCA could have also defined socially disadvantaged individual status based on race-neutral factors such as geographic location, family size, risk of eviction, mortgage debt, or countless others and used those factors to prioritize applications. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

138.    *Second*, DCA's prioritizing applications for socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that homeowners in DCA's preferred racial and ethnic groups are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. And in the context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. That is especially true for white homeowners in Georgia with annual household income between 100% and 150% AMI who are entirely barred from assistance unless they can qualify as socially disadvantaged based on some other indicator. Homeowners of DCA's preferred racial and ethnic groups in that income range, however, can apply for assistance. Moreover, DCA's program has "finite resources," which means that any prioritization makes a big difference—applicants who qualify as socially disadvantaged individuals based on their race have earlier and easier access to funds than applicants who do not meet the racial criteria and applicants at the back of the line risk having crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 721 F. Supp. 3d at 496 ("[T]he fact that the latter applicants have a backdoor to benefits doesn't change

the initial disadvantage conferred by the stereotype."); *see SFFA*, 600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

139.    *Third*, DCA's Georgia Mortgage Assistance program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing homeowners' applications based on race—for example, prioritizing a minority applicant who lost his job due to supply chain issues caused by the COVID-19 pandemic and has trouble making mortgage payments due to the loss of income has nothing to do with remediating past discrimination. In any event, the program is underinclusive—the program excludes both minority homeowners who do not fall within its income limits and those white homeowners who have experienced discrimination. The program is also underinclusive in that it prioritizes assistance to certain preferred minority racial and ethnic groups, but those groups do not include other minority groups who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. DCA's program is also overinclusive—it prioritizes applications submitted by non-white homeowners regardless of whether those homeowners or their specific racial groups have experienced housing discrimination. Moreover, the income limits for applicants with annual household income between 100% and 150% AMI are arbitrary—drawing explicit racial lines for who can apply for assistance in that income range does nothing to remedy past discrimination.

140.    Because DCA's intentional use of race in prioritizing applications as a part of its Georgia Mortgage Assistance program fails strict scrutiny, DCA's actions violate the Equal Protection Clause and Title VI.

141.    Plaintiffs and other class members are the intended beneficiaries of the federal program receiving assistance—namely, eligible homeowners entitled to receive funds through the Georgia Mortgage Assistance program.

142.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of DCA's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all Georgia Mortgage Assistance funds that they have been wrongfully deprived of because of their race.

143.    Plaintiffs and other Class members are also entitled to nominal damages for DCA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

144.    Because DCA's violations of the Equal Protection Clause and Title VI are ongoing, Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that DCA's Georgia Mortgage Assistance program violates Title VI and the Equal Protection Clause and requiring DCA consider all new applications on a race-neutral basis.

145.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring  that DCA's Georgia Mortgage Assistance program violates Title VI and the Equal Protection Clause and requiring DCA to stop administering the program in a racially discriminatory manner, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

146.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

  a.  Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;
  b.  Award Plaintiffs and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c. Award Plaintiffs and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d. Declare that Defendants' racially discriminatory development, marketing, and administration of the Georgia Mortgage Assistance program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner.

e. Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of the Georgia Mortgage Assistance program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

f. Enter judgment in favor of Plaintiffs and the Class members;

g. Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

h. Order such further relief as the Court may deem proper and just.

Dated: January 30, 2025                     Respectfully submitted,

                                            */s/ Jared B. Magnuson*
                                            _____

William T. Thompson*                        Jared B. Magnuson
24088531 (TX)                               *Lead Counsel*
Matthew H. Frederick*                       131189 (GA)
24040931 (TX)                               Lehotsky Keller Cohn LLP
Lehotsky Keller Cohn LLP                    3280 Peachtree Road NE
408 W. 11th Street, 5th Floor               Atlanta, GA 30305
Austin, TX 78701                            (512) 693-8350
(512) 693-8350                              jared@lkcfirm.com
will@lkcfirm.com
matt@lkcfirm.com
                                            Jonathan F. Cohn*
                                            2972578 (NY)
Mark M. Rothrock*                           Lehotsky Keller Cohn LLP
56747 (NC)                                  200 Massachusetts Avenue, NW
Lehotsky Keller Cohn LLP                    Suite 700
8513 Caldbeck Drive                         Washington, DC 20001
Raleigh, NC 27615                           (512) 693-8350
(336) 416-3326                              jon@lkcfirm.com
mark@lkcfirm.com


                                            *Pro Hac Vice Applications Forthcoming*


                                    *Attorneys for Plaintiffs*